Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Priscilla D. Kam, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL   INSURANCE   COMPANY   and   GEICO
CASUALTY COMPANY,                                                      Docket No.: _____(      )

                                             Plaintiffs,

              -against-

MALVINA DRUG CORP.,
IVS PHARMACY CORP.,
RAHBAR NABIEVA, and
INOYATOV VINYAMIN,

                                             Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## **COMPLAINT**

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Malvina Drug Corp., IVS Pharmacy

Corp., Rahbar Nabieva, and Inoyatov Vinyamin (collectively, the "Pharmacy Defendants"),

hereby allege as follows:

1.      This action seeks to terminate a fraudulent scheme perpetrated by the Defendants who exploited the New York "No-Fault" insurance system by submitting more than $1,629,400.00 in fraudulent pharmaceutical billing to GEICO for pharmaceuticals dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").   Specifically, the Pharmacy Defendants submitted, or caused to be submitted, thousands of fraudulent claims with exorbitant charges for a set of specifically targeted, medically unnecessary "pain relieving" topical prescription drug products, in the form of Diclofenac Sodium Gel, Lidocaine 5% Ointment, MedX Patches with Lidocaine, and Lidocaine 5% Patches (collectively, the "Fraudulent Topical Pain Products"), as well as a select few oral medications, primarily in the form of oral pain relievers and muscle relaxants (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.      To effectuate the scheme, Pharmacy Defendants Malvina Drug Corp. ("Malvina"), IVS Pharmacy Corp. ("IVS Pharmacy"), Rahbar Nabieva ("Nabieva"), and Inoyatov Vinyamin ("Vinyamin") entered into illegal, collusive agreements with prescribing healthcare providers (the "Prescribing Providers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics").   Pursuant to these collusive agreements, the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to prescribe and direct large volumes of prescriptions for the targeted Fraudulent Topical Pain Products to Malvina and IVS Pharmacy, in place of other effective, but much-less costly prescription and non-prescription drug products.

3.    The Pharmacy Defendants, in exchange for paying kickbacks or providing other financial incentives, received thousands of medically unnecessary, duplicitous prescriptions from the Prescribing Providers and Clinic Controllers pursuant to predetermined protocols. These prescriptions were frequently generated using preprinted template prescription forms or, at times, preset labels and stamps created by the Pharmacy Defendants and distributed to the Prescribing Providers and Clinic Controllers in violation of law.

4.    The Pharmacy Defendants created and provided the preprinted prescription forms and preset stamps or labels in violation of law to further the voluminous prescription of the Fraudulent Pharmaceuticals, which were targeted by the Pharmacy Defendants because they could acquire them at low cost but dispense them at exorbitant charges in order to exploit the patients for financial gain.

5.    For example, the Pharmacy Defendants, through both Malvina and IVS Pharmacy, typically billed $2,381.00 to fill a single prescription for MedX Patches with Lidocaine, and between $454.40 and $679.10 to fill a single prescription for Lidocaine 5% Patches.  Malvina and IVS Pharmacy also typically billed between $1,223.00 and $1,832.00 for a single tube of Lidocaine 5% Ointment and between $1,891.00 and $2,834.00 for a single tube of Diclofenac Gel 3%.

6.    The Pharmacy Defendants' scheme not only inflated the charges submitted to GEICO and other New York automobile insurers, but also posed serious risks to patients' health, safety and well-being.  For example, risks from diclofenac sodium include gastrointestinal effects, as well as major cardiovascular events, such as heart attack and stroke, while the use of lidocaine can cause heart arrhythmia, blood toxicity, and symptoms of overdose if not used correctly.

7.      By this action, GEICO seeks to recover more than $102,900.00 that the Pharmacy Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay Malvina and IVS Pharmacy reimbursement of over $1,488,600.00 in pending fraudulent No-Fault claims that the Pharmacy Defendants submitted or caused to be submitted through Malvina and IVS Pharmacy because:

    (i)      The Pharmacy Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Malvina and IVS Pharmacy in exchange for unlawful kickbacks and other financial incentives;

    (ii)      Malvina and IVS Pharmacy billed for pharmaceutical products that were prescribed and dispensed pursuant to illegal, collusive agreements, as well as predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;

    (iii)      the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and dispensed in large volumes to Insureds through Malvina and IVS Pharmacy with exorbitant charges, in place of other effective, less costly pharmaceuticals; and

    (iv)      The Pharmacy Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals pursuant to the illegal, invalid, duplicitous, and forged prescriptions.

8.      The Defendants fall into the following categories:

    (i)      Malvina and IVS Pharmacy are New York corporations engaged in a fraudulent scheme in which they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, collusive agreements and predetermined protocols, without regard to genuine patient care, in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault benefits to which they are not entitled;

    (ii)      Nabieva is the record owner of Malvina and, along with Vinyamin, the record co-owner of IVS Pharmacy; and

    (iii)      Vinyamin, along with Nabieva, is the record co-owner of IVS Pharmacy.

9.      The Pharmacy Defendants' scheme began in 2019 and continues uninterrupted to the present day in that the Pharmacy Defendants continue to attempt to collect from GEICO payment on their unpaid fraudulent claims. As discussed more fully below, the Pharmacy Defendants at all times have known that: (i) the Pharmacy Defendants participated in illegal, collusive relationships in which they steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Malvina and IVS Pharmacy in exchange for unlawful kickbacks and other financial incentives; (ii) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care; (iii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products that they acquired at low cost and dispensed to Insureds in large volumes at inflated charges, in place of other effective, less costly pharmaceuticals; and (iv) the Pharmacy Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, duplicitous, and forged prescriptions.

10.      Based on the foregoing, neither Malvina nor IVS Pharmacy have – or ever had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.  The chart attached hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to-date which the Pharmacy Defendants submitted, or caused to be submitted, to GEICO through the United States mail.  As a result of the Pharmacy Defendants' scheme, GEICO has incurred damages of approximately $102,900.00.

## THE PARTIES

### I.      Plaintiffs

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland.   GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

12.     Malvina is a New York corporation, incorporated on or about April 19, 2018, with its principal place of business at 300 Hempstead Turnpike, Suite 214, West Hempstead, New York.  Malvina was first registered to operate as a pharmacy in New York State on December 14, 2018, and as of the date of this Complaint, is still listed as an active pharmacy with the New York State Education Department's Office of the Professions, as well as an active corporation with the New York State Division of Corporations.

13.     Malvina knowingly submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

14.     IVS Pharmacy is a New York corporation, incorporated on or about September 13, 2017, with its principal place of business at 185-08 Union Turnpike, Suite 109, Fresh Meadows, New York 11366.  IVS Pharmacy was first registered to operate as a pharmacy in New York on February 14, 2019, and as of the date of this Complaint, is still listed as an active pharmacy with the New York State Education Department's Office of the Professions, as well as an active corporation with the New York State Division of Corporations.

15.     IVS Pharmacy knowingly submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

16.     The fraudulent claims submitted to GEICO by the Pharmacy Defendants through Malvina and IVS Pharmacy resulted from illegal, collusive agreements with the Prescribing Providers and Clinic Controllers who work at or illegally own and control the No-Fault Clinics.

17.     Defendant Nabieva resides in and is a citizen of New York.  Nabieva is the owner of Malvina and, along with Vinyamin, is the co-owner of IVS Pharmacy.

18.     Defendant Vinyamin resides in and is a citizen of New York. Vinyamin, along with Nabieva, is the co-owner of IVS Pharmacy.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

20.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331, over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

21.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

22.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.    An Overview of New York's No-Fault Laws

23.    GEICO underwrites automobile insurance in the State of New York.

24.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

25.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

26.    An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment of benefits form ("AOB"), a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

27.    Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

28.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

29.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

30.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     <u>An Overview of Applicable Licensing Laws</u>

31.     Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

32.     Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of

services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

33.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

34.     Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

35.     New York Education Law § 6810 prohibits pharmacies from dispensing a drug when the prescription form for that drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

36.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

37.     Pursuant to 8 N.Y.C.R.R. § 63.1(7)(ii), when a prescription is delivered to the patient off the premises of a pharmacy through mail delivery, a delivery service, or otherwise, the pharmacy shall, among other things, include with each prescription a written offer to counsel the patient or person authorized to act on behalf of the patient who presents the prescription.

38.     Pursuant to Education Law §6512, §6530 (11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for

10

the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

39.    New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

40.    New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

41.    New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

42.    Pursuant to New York Education Law § 6808, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

## III.    The Pharmacy Defendants' Scheme Involving The Fraudulent Pharmaceuticals

### A.  Overview of the Scheme

43.    Beginning in 2019, and continuing through the present day, the Pharmacy Defendants masterminded and implemented a fraudulent scheme in which they used Malvina and IVS Pharmacy to exploit patients for financial gain by billing the New York automobile industry for millions of dollars in inflated charges related to the Fraudulent Pharmaceuticals they purportedly dispensed to Insureds.

44.     The Pharmacy Defendants perpetrated their scheme and submitted their fraudulent billing through Malvina from June 2019 through September 2019, at which time they ceased billing through Malvina and promptly began submitting their fraudulent billing through IVS Pharmacy.

45.     Malvina and IVS Pharmacy purported to be storefront neighborhood pharmacies located on the Nassau County and Queens County border in New York – approximately 10 miles apart from each other.

46.     Prior to June 2019, neither Malvina nor IVS Pharmacy submitted any billing to GEICO.

47.     Malvina and IVS Pharmacy submitted the bulk of their voluminous billing to GEICO for the Fraudulent Pharmaceuticals in a few short months, though both pharmacies remain as "active" corporations with New York State, IVS submitted further billing, and both Malvina and IVS continue to pursue collection on the voluminous billing submitted to GEICO.

48.     Despite suddenly ceasing the submission of large volumes of billing to GEICO, the Pharmacy Defendants remain active and continue their fraudulent scheme by hiring law firms to pursue collection of the unpaid fraudulent charges submitted to GEICO, through hundreds of separate collection proceedings seeking recovery on the individual bills, which proceedings may continue for years.

49.     The Pharmacy Defendants' continued collection efforts through hundreds of separate no-fault arbitration or civil court collection proceedings is an essential part of their fraudulent scheme since they know it is impractical for a no-fault arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Pharmacy Defendants' large scale-scale, complex fraud scheme involving the

prescription, steering, and dispensing of fraudulent pharmaceutical products to hundreds of patients across numerous different clinics located throughout the metropolitan area.

50.    Malvina and IVS Pharmacy operated, and continue to operate, as part of the same fraudulent scheme, notwithstanding the submission of fraudulent billing under two different names and two different tax identification numbers, and the filing of numerous separate collections proceedings to collect the fraudulent billing on behalf of these two ostensibly separate pharmacies.

51.    Malvina and IVS Pharmacy have common ownership, each submitted large volumes of billing over short periods of time, each used similar forms, each used the same postage meter to mail their bills to GEICO from the same zip code in Rego Park, Queens, and each billed for the same Fraudulent Pharmaceuticals.

52.    In a mere five months, the Pharmacy Defendants submitted over $1,629,400.00 in fraudulent billing to GEICO alone, under the names of Malvina and IVS Pharmacy.

53.    Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, both Malvina's and IVS Pharmacy's business largely focused on a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products).

54.    In fact, approximately 95% of the billing the Pharmacy Defendants submitted to GEICO through each Malvina and IVS Pharmacy was for the Fraudulent Topical Pain Products.

55.    Malvina submitted to GEICO over $691,000.00 in claims for reimbursement, of which at least $666,100.00 was for Fraudulent Topical Pain Products.

56.    IVS Pharmacy submitted to GEICO over $938,400.00 in claims for reimbursement, of which at least $883,600.00 was for Fraudulent Topical Pain Products.

57.     In total, the Pharmacy Defendants have submitted – to GEICO alone – over $1,549,700.00 in claims for reimbursement of Fraudulent Topical Pain Products.

58.     In keeping with the fact that the Pharmacy Defendants targeted a specific and limited set of pharmaceuticals that enabled them to maximize their inflated charges to GEICO, as stated above, the Pharmacy Defendants, through both Malvina and IVS Pharmacy, only dispensed and billed for four specific topical pain products – MedX Patches with Lidocaine ("MedX Patches"), Lidocaine 5% Patches, Diclofenac Sodium Gel, and Lidocaine 5% Ointment.

59.     The Pharmacy Defendants chose these four particular products – MedX Patches, Lidocaine 5% Patches, Diclofenac Sodium Gel, and Lidocaine 5% Ointment -- because they could acquire them at low cost and submit claims for reimbursement to GEICO at exorbitant prices after illegally steering prescriptions to themselves.

60.     For example, as part of their fraudulent scheme, the Pharmacy Defendants specifically targeted the prescription, dispensation, and billing of MedX Patches – which have not been proven to be safe or effective, and which are not approved by the United States Food and Drug Administration ("FDA") – because they could acquire them at low cost and submit charges for reimbursement at $2,381.00 per prescription.  The Pharmacy Defendants targeted these patches despite the availability of other lidocaine products which are FDA-approved and available over-the-counter at a fraction of the cost.

61.     While 95% of the billing the Pharmacy Defendants submitted through Malvina and IVS Pharmacy was for four specific topical pain products (i.e., the Fraudulent Topical Pain Products), the remaining 5% of the billing they regularly submitted through both pharmacies was always for the same limited set of oral pain relievers, including nonsteroidal anti-inflammatory drugs ("NSAIDs") and muscle relaxers.

62.     In furtherance of the fraudulent scheme, the Pharmacy Defendants entered into illegal, collusive agreements with the Prescribing Providers and Clinic Controllers in which the Pharmacy Defendants steered them to prescribe and direct large volumes of prescriptions to Malvina and IVS Pharmacy for the targeted set of Fraudulent Pharmaceuticals which were purportedly prescribed and dispensed to patients at various No-Fault Clinics.

63.     The Pharmacy Defendants, in exchange for the payment of kickbacks, received medically unnecessary, duplicitous prescriptions from the Prescribing Providers and Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols. The prescriptions often contained preprinted template prescription forms or, at times, preset labels or stamps which the Pharmacy Defendants provided to the Prescribing Providers and Clinic Controllers so as to make it as convenient as possible for them to prescribe, or caused to be prescribed, the Fraudulent Pharmaceuticals and to direct those prescriptions to the Pharmacy Defendants.

64.     Notably, the No-Fault Clinics where the prescriptions steered to Malvina and IVS were generated include clinics that are essentially one-stop shops for fraud with Prescribing Providers who have often been the subjects of investigations and lawsuits commenced by various New York insurers with regard to their fraudulent billing and treatment practices, including the illegal ownership and control of their professional corporations by unlicensed laypersons, and their participation in various treatment and billing protocol schemes aimed at generating profits without regard to patient care.

65.     In keeping with the fact that Pharmacy Defendants illegally steered the Prescribing Providers and the Clinic Controllers at the No-fault Clinics to provide Malvina and IVS Pharmacy with prescriptions for the Fraudulent Pharmaceuticals pursuant to predetermined

fraudulent protocols and solely to maximize profits, Insureds were never given the option to use a pharmacy of their own choosing.

66.     Instead, through their collusive arrangements, the Pharmacy Defendants ensured that the Prescribing Providers and Clinic Controllers directed the prescriptions for the Fraudulent Pharmaceuticals to Malvina and IVS Pharmacy regardless of the distance of these pharmacies from the Insureds or the No-Fault Clinics where they were treating.

67.     In furtherance of the scheme, and in keeping with the fact that the Fraudulent Pharmaceuticals dispensed by Malvina and IVS Pharmacy were prescribed pursuant to collusive arrangements and predetermined protocols rather than genuine patient care, the Pharmacy Defendants created and distributed to the Prescribing Providers and Clinic Controllers what is essentially a product list – disguised as a "prescription order form" – of the various Fraudulent Pharmaceuticals that Malvina and IVS Pharmacy dispensed.

68.     The pre-printed "checklist-type" prescription order forms (the "Fraudulent Prescription Forms") created by the Pharmacy Defendants and distributed to the Prescribing Providers and Clinic Controllers list the names of the Fraudulent Pharmaceuticals the Pharmacy Defendants dispense and bill for, and the quantity in which they were to be prescribed and dispensed to Insureds.

69.     The Fraudulent Prescription Forms ensured that the Prescribing Providers would prescribe, or the Clinic Controllers would cause to be prescribed, specifically targeted predetermined Fraudulent Topical Pain Products (i.e., Diclofenac Sodium Gel, Lidocaine 5% Ointment, MedX Patches, and Lidocaine 5% Patches) so that the Pharmacy Defendants could submit those prescriptions to GEICO in support of the claims for reimbursement at egregiously inflated rates. Additionally, the Fraudulent Prescription Forms allowed the Prescribing Providers

to prescribe other Fraudulent Pharmaceuticals, including predetermined oral NSAIDs and muscle relaxers to further increase the Pharmacy Defendants' profits.

70.     The Prescribing Providers allegedly chose which predetermined product(s) should be dispensed to the Insureds by marking off or circling one of designated boxes on the Fraudulent Prescription Forms.

71.     Some of the Fraudulent Prescription Forms generated and distributed by the Pharmacy Defendants were even tailored to a specific Prescribing Provider in that the Prescribing Provider's name, address and/or phone number, license number and national provider identification ("NPI") number were preprinted on the Fraudulent Prescription Form.

72.     Some of the Fraudulent Prescription Forms generated and distributed by the Pharmacy Defendants were tailored to a No-Fault Clinic in that the clinic's address and/or phone number were preprinted on the Fraudulent Prescription Form.

73.     Additionally, many of the Pharmacy Defendants' Fraudulent Prescription Forms contained a preprinted, generic "Statement of Medical Necessity" alleging that topical pain products were necessary to avoid side effects of orally administered medications, and to lower doses of and prevent dependence on oral medications.  Specifically, the Fraudulent Prescription Forms contained the following preprinted statement:

> Statement of Medical Necessity:
>
> Side effects associated with oral administration can often be avoided when medications are used topically.  When medications are administered topically, they are not absorbed through the gastrointestinal system and do not undergo first pass hepatic metabolism. Topical creams/patches will be used in conjunction with lower doses of oral medications to prevent dependence and side effects of oral medications.

74.    The "Statement of Medical Necessity" included on these prescriptions holds no pharmacologic validity.  First-pass hepatic metabolism is a process where drugs absorbed from the gastrointestinal tract travel first to the liver through the portal vein, where a fraction of drug is broken down and removed from the bloodstream. While the amount of the drug removed from the bloodstream through first-pass hepatic metabolism varies from medication to medication, certain drug ingredients in the Fraudulent Topical Pain Products, such as diclofenac sodium, are not significantly affected by first-pass metabolism and, therefore, can be administered orally with an efficacious outcome. Moreover, first-pass metabolism is irrelevant with regard to the safety of the Fraudulent Topical Pain Products.

75.    Despite the blanket statement purporting to express concern about side effects associated with oral administration, certain Prescribing Providers regularly prescribed oral medications contemporaneous to prescribing a Fraudulent Topical Pain Product.

76.    Annexed hereto at Exhibits "2" and "3" respectively, are representative samples of the prescriptions issued by the Prescribing Providers using the Pharmacy Defendants' Fraudulent Prescription Forms, which the Pharmacy Defendants submitted to GEICO in support of their fraudulent billing through Malvina and IVS Pharmacy.

77.    Notably, New York law prohibits Malvina and IVS Pharmacy from dispensing against these types of forms containing multiple predetermined drug products, and likewise prohibits the Prescribing Providers from writing prescriptions on these types of forms.

78.    Specifically, New York Education Law § 6810(7) provides as follows:

"No prescription for a drug written in this state by a person authorized to issue such prescription shall be on a prescription form which authorizes the dispensing or compounding of any other drug. No drug shall be dispensed by a pharmacist when such prescription form includes any other drug."

79.     In other words, the Education Law prohibits pharmacists from dispensing drugs when the corresponding prescription includes any other drugs.  Id.

80.     Moreover, as of March 27, 2016, to combat the growing problem of prescription fraud, N.Y. Public Health Law requires that all prescriptions issued in New York State – for both controlled and non-controlled substances – must be prescribed electronically.

81.     In the limited circumstances in which a prescription is excepted from the electronic prescription requirement, N.Y. Public Health Law requires that a written prescription in New York State be written on an official *serialized* New York State prescription bearing the prescriber's signature as well as the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.   See, N.Y. Public Health Law § 281, see also N.Y. Education Law § 6810(8).

82.     The Pharmacy Defendants' Fraudulent Prescription Forms are invalid and illegal in that they are not official serialized New York State prescriptions bearing the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.

83.     As an alternative to the Fraudulent Prescription Form, the Pharmacy Defendants provided the Prescribing Providers and Clinic Controllers with preset labels or rubber stamps which, like the Fraudulent Prescription Forms, contained the names of the Fraudulent Pharmaceuticals. The Prescribing Providers then used these stamps or labels on their official New York State prescription pads to prescribe the Fraudulent Pharmaceuticals to the Insureds.

84.     Annexed hereto at Exhibit "4" is a representative sample of the prescriptions issued by the Prescribing Providers using labels or rubber stamps, which the Pharmacy Defendants submitted to GEICO in support of their fraudulent billing through Malvina.

85.     The Pharmacy Defendants provided the Prescribing Providers and Clinic Controllers with the Fraudulent Prescription Forms, stamps and labels pursuant to predetermined, fraudulent protocols and collusive arrangements in order to illegally steer the Prescribing Providers and Clinic Controllers to prescribe, or cause the prescription of, as many Fraudulent Pharmaceuticals as possible, and direct those prescriptions to Malvina and IVS Pharmacy.

86.     The Pharmacy Defendants used the illegal, invalid, and fraudulent prescriptions to bill GEICO and other insurers millions of dollars for the Fraudulent Pharmaceuticals.

### B. **The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care In Order to Exploit Patients for Financial Gain**

87.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, Insureds treated by the Prescribing Providers at No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from Malvina and IVS Pharmacy – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

88.     Despite this basic goal, the treatment reports for the Insureds almost uniformly reflected that the Insureds did not get better, did not return to good health, and did not experience improvement in their conditions such that the Insureds could terminate medical treatment expeditiously and return to normal activity.

89.     Rather, as part of the predetermined protocol, the Prescribing Providers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that healthcare providers at the No-Fault Clinics

purported to render to Insureds.  These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products such as the Fraudulent Pharmaceuticals.

90.     Notwithstanding the creation of the examination reports, the Prescribing Providers' prescriptions of the Fraudulent Pharmaceuticals dispensed by Malvina and IVS Pharmacy were based on predetermined protocols designed to exploit Insureds' for financial gain, without regard to the genuine needs of the patients.

91.     To the extent any examination was actually performed at all, the Prescribing Providers failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals. Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the Prescribing Providers often did not know whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

92.     The Prescribing Providers also did not document in their examination reports whether the patients were intolerant of oral medications necessitating a prescription for a Fraudulent Topical Pain Product dispensed by Malvina or IVS Pharmacy.

93.     The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by Malvina or IVS Pharmacy were actually used by the patient.

94.     The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals dispensed by Malvina or IVS

Pharmacy provided any pain relief to the patient or were otherwise effective for the purpose prescribed.

95.     At times, the Prescribing Providers failed to document in any of their examination reports that the patient was to receive a Fraudulent Pharmaceutical.  For example:

- Insured K.J.D. was allegedly involved in a motor vehicle accident on June 18, 2019.  She sought treatment with Metro Pain Specialists, P.C. ("Metro Pain") at a No-Fault Clinic located at 1975 Linden Blvd., Elmont, NY.  She underwent an initial examination with Stanley Kim, D.O. ("Dr. Kim") on June 20, 2019. Despite the fact that the Fraudulent Topical Pain Products dispensed by the Pharmacy Defendants are pre-printed in the treatment plan section of Metro Pain's examination reports, Dr. Kim left this section of the treatment plan blank indicating that no medications were prescribed.  Nevertheless, on June 20, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to a Fraudulent Prescription Form signed by Dr. Kim on June 20, 2019. K.J.D. underwent a follow-up examination with Dr. Kim on September 10, 2019, at which time no medications were marked off in the treatment plan indicating that no medications were prescribed. Nevertheless, on September 16, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to a Fraudulent Prescription Form signed by Dr. Kim on September 10, 2019. K.J.D. underwent a follow-up examination with Dr. Kim on October 22, 2019.  Once again, no medications were marked off in the treatment plan section of the examination report indicating that no medications were prescribed. Nevertheless, on November 3, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to a Fraudulent Prescription Form signed by Dr. Kim on October 22, 2019.

- Insured L.D. was allegedly involved in a motor vehicle accident on May 18, 2019. He sought treatment with Metro Pain at a No-Fault Clinic located at 1975 Linden Blvd., Elmont, NY.  He underwent an initial examination with Dr. Kim on May 23, 2019. Despite the fact that the Fraudulent Topical Pain Products dispensed by the Pharmacy Defendants are pre-printed in the treatment plan section of Metro Pain's examination reports, Dr. Kim left this section of the treatment plan blank indicating that no medications were prescribed.  Nevertheless, on June 3, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to an undated Fraudulent Prescription Form signed by Dr. Kim.  L.D. underwent a follow-up examination with Dr. Kim on October 15, 2019, at which time no medications were marked off in the treatment plan, indicating that no medications were prescribed. Nevertheless, on November 3, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to a Fraudulent Prescription Form signed by Dr. Kim on October 15, 2019. L.D. underwent a follow-up examination with Dr. Kim on November 21, 2019.  Once again, no medications were marked off in the treatment plan indicating that no

medications were prescribed. Nevertheless, on November 25, 2019 – after the Pharmacy Defendants ceased billing GEICO – Albertson Pharmacy, Inc. dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to a prescription issued by Dr. Kim on November 21, 2019.

- Insured C.T. was allegedly involved in a motor vehicle accident on March 19, 2019.  On March 28, 2019, he sought treatment with Metro Pain at a No-Fault Clinic located at 1975 Linden Blvd., Elmont, NY.  On May 21, 2019, Dr. Kim performed a follow-up examination on C.T. Despite the fact that the Fraudulent Topical Pain Products dispensed by the Pharmacy Defendants are pre-printed in the treatment plan section of Metro Pain's examination reports, Dr. Kim left this section of the treatment plan blank indicating that no medications were prescribed.  Nevertheless, on June 3, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to a Fraudulent Prescription Form signed by Dr. Kim on May 21, 2019.

- Insured S.S. was allegedly involved in a motor vehicle accident on April 13, 2019. She sought treatment with Metro Pain at a No-Fault Clinic located at 1975 Linden Blvd., Elmont, NY and underwent an initial examination with John Greco, M.D. ("Dr. Greco") on April 25, 2019. On May 10, 2019, Modern Rx, Inc. dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to a prescription issued by Dr. Greco on April 25, 2019.  S.S. underwent a follow-up examination with Jacob Keum, D.O. ("Dr. Keum") on July 11, 2019, and despite the fact that Dr. Keum left the preprinted medications section of the treatment plan blank, indicating no medications were prescribed, on July 12, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to a Fraudulent Prescription Form signed by Dr. Keum on July 11, 2019.

- Insured T.M. was allegedly involved in a motor vehicle accident on May 12, 2019. He sought treatment with Metro Pain at a No-Fault Clinic located at 1975 Linden Blvd., Elmont, NY, and underwent an initial examination with Dr. Kim on May 28, 2019. Despite the fact that the Fraudulent Topical Pain Products dispensed by the Pharmacy Defendants are pre-printed in the treatment plan section of Metro Pain's examination reports, Dr. Kim left this section of the treatment plan blank indicating that no medications were prescribed. Nevertheless, on June 3, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to an undated Fraudulent Prescription Form signed by Dr. Kim.

- Insured C.C. was allegedly involved in a motor vehicle accident on September 20, 2019. She sought treatment with at a No-Fault Clinic located at 3910 Church Avenue, Brooklyn NY. On October 7, 2019, she underwent an initial examination with Matthew Prince, N.P. ("NP Prince") of Triboro Medical Services, P.C. ("Triboro Medical"). NP Prince's treatment plan and recommendation did not include the prescription of any medications, yet on October 10, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Patches, ibuprofen, and

cyclobenzaprine pursuant to a Fraudulent Prescription Form signed by NP Prince on October 7, 2019.

- Insured E.L. was allegedly involved in a motor vehicle accident on July 28, 2019. He sought treatment with Metro Pain at a No-Fault Clinic located at 1975 Linden Blvd., Elmont, NY and underwent an initial examination with Dr. Kim on August 6, 2019. Despite the fact that the Fraudulent Topical Pain Products dispensed by the Pharmacy Defendants are pre-printed in the treatment plan section of Metro Pain's examination reports, Dr. Kim left this section of the treatment plan blank indicating that no medications were prescribed.  Nevertheless, on August 9, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to a Fraudulent Prescription Form signed by Dr. Kim on August 6, 2019. Dr. Kim performed a follow-up examination on October 29, 2019 at which time he circled Lidocaine 5% Ointment and Lidoderm (lidocaine) 5% Patches under the treatment plan of the examination report.  On November 3, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment and MedX Patches (which are reimbursed at a higher rate than Lidoderm 5% Patches) pursuant to a Fraudulent Prescription Form signed by Dr. Kim on October 29, 2019.

- Insured E.F. was allegedly involved in a motor vehicle accident on July 10, 2019. She sought treatment with Metro Pain at a No-Fault Clinic located at 1975 Linden Blvd., Elmont, NY and underwent an initial examination with Dr. Kim on July 16, 2019. Despite the fact that the Fraudulent Topical Pain Products dispensed by the Pharmacy Defendants are pre-printed in the treatment plan section of Metro Pain's examination reports, Dr. Kim left this section of the treatment plan blank indicating that no medications were prescribed.  Nevertheless, on July 19, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to a Fraudulent Prescription Form signed by Dr. Kim on July 16, 2019. Dr. Kim performed a follow-up examination on October 17, 2019 and again left the pre-printed prescription medications section of the treatment plan blank, yet on October 18, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to a Fraudulent Prescription Form signed by Dr. Kim on October 17, 2019.

- Insured I.L. was allegedly involved in a motor vehicle accident on September 13, 2019. He sought treatment with Triboro Medical at a No-Fault Clinic located at 3910 Church Avenue, Brooklyn, NY, and underwent an initial examination with NP Prince on September 19, 2019.  At the time of his initial examination, NP Prince did not recommend the patient receive any medications in the treatment plan and recommendation section of his examination report. Yet on October 12, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Patches, ibuprofen, and cyclobenzaprine pursuant to an undated Fraudulent Prescription Form signed by NP Prince.

- Insured D.J. was allegedly involved in a motor vehicle accident on September 19, 2019. She sought treatment at a No-Fault Clinic located at 3910 Church Avenue,

Brooklyn, NY and underwent an initial examination with Michael Alleyne M.D. ("Dr. Alleyne") on September 20, 2019. At the time of his initial examination, Dr. Alleyne did not recommend the patient receive any medications in the treatment plan and recommendation section of his examination report. Yet on October 10, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment and cyclobenzaprine pursuant to a Fraudulent Prescription Form signed by Dr. Alleyne on September 20, 2019. Notably, in addition to Lidocaine 5% Ointment and cyclobenzaprine, the Fraudulent Prescription Form also called for naproxen. It does not appear naproxen was dispensed to J.D. by IVS Pharmacy or any other pharmacy.

96.     At other times, the recommendations and treatment plans of a Prescribing Provider's examination report were inconsistent with the medications actually dispensed by Malvina or IVS Pharmacy.

97.     Specifically, (i) at times, the Prescribing Provider or Clinic Controllers appear to have altered the recommendation and treatment plans of examination reports after the fact to justify duplicitous prescriptions ultimately dispensed and billed by the Pharmacy Defendants; (ii) at times, the prescription submitted by the Pharmacy Defendants in support of their charges were inconsistent with the medications referenced in the Prescribing Provider's treatment and recommendation plan; and (iii) at times, the actual prescriptions allegedly signed by the Prescribing Providers were altered to justify additional billing by the Pharmacy Defendants. For example:

- Insured A.R. was allegedly involved in a motor vehicle accident on March 28, 2019. She sought treatment with Metro Pain at a No-Fault Clinic located at 3041 Avenue U, Brooklyn, NY, and underwent an initial examination with Dr. Alleyne on April 1, 2019. Dr. Alleyne crossed-out the entire pre-printed section of the examination report's treatment plan for prescription medications, which included the Fraudulent Topical Pain Products dispensed by the Pharmacy Defendants. Despite crossing out these medications, Dr. Alleyne or a Clinic Controller used preset stamps to stamp "Lidocaine Oint 5%" and "1st MedX Patch" onto the examination report. It does not appear these prescriptions were ever dispensed to A.R. On April 29, 2019, Dr. Alleyne performed a follow-up examination on A.R. and again crossed out the entire preprinted medication section of the examination report. Despite crossing out these medications, Dr. Alleyne or a Clinic Controller used preset stamps to stamp "Lidocaine Oint 5%" and "1st MedX Patch" onto the

examination report. On May 29, 2019, 21st Century Pharmacy dispensed and billed for MedX Patches pursuant to a prescription issued by Dr. Alleyne on April 29, 2019. On June 17, 2019, Dr. Alleyne performed a follow-up examination on A.R. and again crossed out the entire preprinted medication section of the examination report. Despite crossing out these medications, Dr. Alleyne or a Clinic Controller used preset stamps to stamp "Lidocaine Oint 5%" and "1st MedX Patch" onto the examination report. On June 19, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment and on June 26, 2019 21st Century Pharmacy dispensed and billed for MedX Patches, pursuant to prescriptions issued by Dr. Alleyne on June 17, 2019.

- Insured R.J. was allegedly involved in a motor vehicle accident on April 3, 2019. She sought treatment with Metro Pain at a No-Fault Clinic located at 3041 Avenue U, Brooklyn, NY, and underwent an initial examination with Dr. Alleyne on April 8, 2019. Dr. Alleyne crossed-out the entire preprinted section of the examination report's treatment plan for prescription medications, which included the Fraudulent Topical Pain Products dispensed by the Pharmacy Defendants. Despite crossing out these medications, Dr. Alleyne or a Clinic Controller used preset stamps to stamp "Lidocaine Oint 5%" and "1st MedX Patch" onto the examination report. It does not appear these prescriptions were ever dispensed to R.J.  Dr. Alleyne performed a follow-up examination on R.J. on May 6, 2019 and again crossed-out the entire preprinted section of the treatment plan for prescription medications. Again, he or a Clinic Controller used preset stamps to stamp "Lidocaine Oint 5%" and "1st MedX Patch" onto the examination report. On May 29, 2019, 21st Century Pharmacy dispensed and billed for MedX Patches pursuant to an electronic prescription issued by Dr. Alleyne on May 6, 2019. Dr. Alleyne performed a follow-up examination on R.J. on June 10, 2019 and again crossed-out the entire preprinted medications section of the treatment plan. Once again, he or a Clinic Controller used preset stamps to stamp "Lidocaine Oint 5%" and "1st MedX Patch" onto the examination report. On June 17, 2019, Malvina dispensed and billed for MedX Patches and Lidocaine 5% Ointment pursuant to prescriptions issued by Dr. Alleyne on June 10, 2019 using his prescription pad and preset stamps.

- Insured M.M. was allegedly involved in a motor vehicle accident on June 3, 2019. Thereafter he sought treatment at a No-Fault Clinic located at 828 Utica Avenue, Brooklyn, NY.  On June 25, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment and Lidocaine 5% Patches pursuant to a Fraudulent Prescription Form allegedly signed by Steven Wong, M.D. ("Dr. Wong") on June 19, 2019. Notably, upon information and belief, Dr. Wong did not perform a medical examination on M.M. on or before June 19, 2019, or anytime thereafter. On July 11, 2019, M.M. underwent a follow-up examination with Bhupinder Singh Sawhney, M.D. ("Dr. Sawhney") of BSS Metropolitan Medical, P.C. d/b/a Bhupinder Singh Sawhney ("BSS Medical"), at which time Dr. Sawhney recommended the patient receive Mobic (meloxicam) and cyclobenzaprine. On July 23, 2019, Malvina dispensed and billed for meloxicam and cyclobenzaprine

pursuant to a Fraudulent Prescription Form signed by Dr. Sawhney on July 11, 2019.  This prescription also allowed for one refill of each medication.  On September 9, 2019, Malvina dispensed and billed for meloxicam, cyclobenzaprine, Lidocaine 5% Ointment, and Diclofenac Gel 3%. In support of these charges, the Pharmacy Defendants submitted the Fraudulent Prescription Form allegedly signed by Dr. Sawhney on July 11, 2019 which originally prescribed only meloxicam and cyclobenzaprine with one refill, but was since **altered** to include Lidocaine 5% Ointment and Diclofenac Gel 3%.

- Insured B.B. was allegedly involved in a motor vehicle accident on June 3, 2019. He sought treatment with Metro Pain at a No-Fault Clinic located at 3041 Avenue U, Brooklyn, NY, and underwent an initial examination with Dr. Alleyne on June 10, 2019. Dr. Alleyne crossed-out the entire preprinted section of the examination report's treatment plan for prescription medications, which included the Fraudulent Topical Pain Products dispensed by the Pharmacy Defendants. Despite crossing out these medications, Dr. Alleyne or a Clinic Controller used preset stamps to stamp "Lidocaine Oint 5%" and "1st MedX Patch" onto the examination report. On June 17, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to prescriptions issued by Dr. Alleyne on June 10, 2019 using his prescription pad and preset stamps.

- Insured A.M. was allegedly involved in a motor vehicle accident on October 2, 2019.  She sought treatment with Metro Pain at a No-Fault Clinic located at 1975 Linden Blvd, Elmont, NY, and underwent an initial examination with Dr. Kim on October 3, 2019.  At the time of the initial examination, Dr. Kim circled Lidoderm (lidocaine) 5% Patches in the prescription medications section of the examination report's treatment plan.  On October 7, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment (which was not indicated in the treatment plan) and MedX Patches (which are significantly more expensive than Lidoderm 5% Patches) pursuant to a Fraudulent Prescription Form signed by Dr. Kim on October 3, 2019.  Moreover, Dr. Kim performed a follow-up examination on November 14, 2019, and despite the fact that he left the prescription medications section of the treatment plan blank, on November 19, 2019, Albertson Pharmacy, Inc. dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to a prescription issued by Dr. Kim on November 14, 2019.

- Insured L.P. was allegedly involved in a motor vehicle accident on February 19, 2019.  She sought treatment with Metro Pain at a No-Fault Clinic located at 1767 Southern Blvd., Bronx, NY and underwent an initial examination with Theodros Seyoumm, M.D. ("Dr. Seyoum") on February 28, 2019.  At the time of the initial examination, Dr. Seyoum circled Lidoderm (lidocaine) 5% Patches and Diclofenac Gel 3% in the prescription medications section of the examination report's treatment plan.  On March 6, 2019, LPM Pharmacy, Inc. dispensed and billed for Lidocaine 5% Patches and Diclofenac Gel 3% pursuant to electronic prescriptions issued by Dr. Seyoum on February 28, 2019. Dr. Seyoum performed

a follow-up examination on September 4, 2019 and circled Lidoderm (lidocaine) 5% Patches and ibuprofen in the prescription medications section of the treatment plan.  On September 9, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Patches, ibuprofen, **and** Lidocaine 5% Ointment pursuant to a Fraudulent Prescription Form signed by Dr. Seyoum on September 4, 2019.

- Insured M.G was allegedly involved in a motor vehicle accident on September 30, 2019.  He sought treatment with Metro Pain at a No-Fault Clinic located at 1767 Southern Blvd., Bronx, NY and underwent an initial examination with Dr. Seyoum on October 9, 2019.  At the time of the initial examination, Dr. Seyoum circled Lidocaine 5% Patches and naproxen in the prescription medications section of the treatment plan.  On October 12, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Patches, naproxen, **and** Diclofenac Gel 3% pursuant to a Fraudulent Prescription Form signed by Dr. Seyoum on October 9, 2019.

- Insured S.M. was allegedly involved in a motor vehicle accident on August 19, 2019.  Thereafter, he sought treatment with Metro Pain at a No-Fault Clinic located at 1767 Southern Blvd., Bronx, NY. On September 26, 2019, he underwent an initial examination with Dr. Seyoum who circled Lidocaine 5% Ointment and naproxen in the prescription medications section of the examination report. On October 3, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment, naproxen, **and** Lidocaine 5% Patches pursuant to a Fraudulent Prescription Form signed by Dr. Seyoum on September 26, 2019.

- Insured S.M. was allegedly involved in a motor vehicle accident on September 20, 2019. Later that day, he sought treatment with Triboro Medical at a No-Fault Clinic located at 3910 Church Avenue, Brooklyn, NY and underwent an initial examination with Dr. Alleyne. Upon initial examination, Dr. Alleyne did not recommend the Insured receive any medications in the treatment plan section of the examination report. Nevertheless, on October 10, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment, naproxen, and cyclobenzaprine pursuant to a Fraudulent Prescription Form signed by Dr. Alleyne on September 20, 2019.

- Insured Y.V. was allegedly involved in a motor vehicle accident on September 13, 2019. Later that day, he sought treatment with Triboro Medical at a No-Fault Clinic located at 3910 Church Avenue, Brooklyn, NY and underwent an initial examination with Dr. Alleyne. Upon initial examination, Dr. Alleyne did not recommend the Insured receive any medications in the treatment plan section of the examination report. Nevertheless, on October 10, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment, naproxen, and cyclobenzaprine pursuant to a Fraudulent Prescription Form signed by Dr. Alleyne on September 13, 2019.

98.     At times, Prescribing Providers appear to have issued prescriptions for Fraudulent Pharmaceuticals – which were ultimately dispensed and billed by the Pharmacy Defendants – without examining the patient in the first instance, while at other times, the Pharmacy Defendants appear to have dispensed and billed for Fraudulent Pharmaceuticals without any prescription whatsoever from a Prescribing Provider. For example:

- Insured D.D. was allegedly involved in a motor vehicle accident on July 13, 2019. Thereafter, he sought treatment at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, NY. On August 13, 2019, he underwent an initial examination with Hyeong Lim, N.P. ("NP Lim") of Riverside Medical Services, P.C. ("Riverside Medical"). On September 9, 2019, Atlas Pharmacy, LLC dispensed and billed for Lidocaine 5% Ointment pursuant to a prescription issued by Stella Amanze, P.A. ("PA Amanze") on September 6, 2019. There is no indication that PA Amanze examined D.D. on or before September 6, 2019.  On October 20, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment pursuant to a Fraudulent Prescription Form signed by Richard Apple, M.D. ("Dr. Apple") on October 5, 2019.  There is no indication that Dr. Apple examined D.D. on or before October 5, 2019.

- Insured H.M. was allegedly involved in a motor vehicle accident on July 31, 2019.  Thereafter, she sought treatment with Riverside Medical at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, NY. She underwent an initial examination with Rivka Weiss, N.P. ("NP Weiss") on August 6, 2019 and a follow-up examination with PA Amanze on August 30, 2019.  On September 4, 2019, Atlas Pharmacy, LLC dispensed and billed for Lidocaine 5% Patches and Diclofenac Gel 3% pursuant to a prescription issued by PA Amanze on August 30, 2019.  On October 12, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment pursuant to a Fraudulent Prescription Form signed by Dr. Apple on September 28, 2019.  There is no indication that Dr. Apple examined H.M. on or before September 28, 2019.

- Insured L.N. was allegedly involved in a motor vehicle accident on August 30, 2019.  Thereafter, she sought treatment at a No-Fault Clinic located at 3910 Church Avenue, Brooklyn, NY. On September 10, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Patches, ibuprofen, and cyclobenzaprine pursuant to a Fraudulent Prescription Form signed by NP Prince on September 4, 2019.  There is no indication that NP Prince examined L.N. on or before September 4, 2019. In fact, there is no indication that L.N. underwent any medical evaluation whatsoever on or before September 4, 2019.  Furthermore, L.N. began treating at a different No-Fault Clinic located at 1120 Morris Park Avenue, Bronx, NY on September 13, 2019.

- Insured L.A.A. was allegedly involved in the same motor vehicle accident as L.N., supra, on August 30, 2019. Thereafter, she sought treatment at a No-Fault Clinic located at 3910 Church Avenue, Brooklyn, NY. On September 10, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Patches and ibuprofen pursuant to a Fraudulent Prescription Form signed by NP Prince on September 4, 2019. There is no indication that NP Prince examined L.A.A. on or before September 4, 2019. In fact, there is no indication that L.A.A. underwent any medical evaluation whatsoever on or before September 4, 2019. Furthermore, L.A.A. began treating at a different No-Fault Clinic located at 1120 Morris Park Avenue, Bronx, NY on September 16, 2019.

- Insured W.A. was allegedly involved in the same motor vehicle accident as L.N. and L.A.A., supra, on August 30, 2019. Thereafter, he sought treatment at a No-Fault Clinic located at 3910 Church Avenue, Brooklyn, NY. On September 10, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Patches, ibuprofen, and cyclobenzaprine pursuant to a Fraudulent Prescription Form signed by NP Prince on September 4, 2019. There is no indication that NP Prince examined W.A. on or before September 4, 2019. In fact, there is no indication that W.A. underwent any medical evaluation whatsoever on or before September 4, 2019. Furthermore, W.A. began treating at a different No-Fault Clinic located at 1120 Morris Park Avenue, Bronx, NY on September 13, 2019.

- Insured A.A. was allegedly involved in a motor vehicle accident on September 9, 2019. Thereafter, he sought treatment at a No-Fault Clinic located at 97-01 101st Avenue, Ozone Park, NY. On September 10, 2019, he underwent initial examination with Radha K. Gara, M.D. ("Dr. Gara") of Gara Medical Care, P.C. ("Gara Medical"). At the time of the initial examination, Dr. Gara issued a prescription for Diclofenac Gel 3% which was dispensed and billed by Affinity Rx on October 1, 2019. On October 13, 2019, IVS Pharmacy dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patches, and Lidocaine 5% Ointment, and identified Dr. Gara as the Prescribing Provider on its claim for reimbursement. Notably, IVS Pharmacy did not submit any prescription in support of its charges, and there is no indication that Dr. Gara performed a follow-up examination on the Insured, or issued any additional prescriptions, on or before October 13, 2019.

- Insured M.K. was allegedly involved in a motor vehicle accident on September 16, 2019. Thereafter, she sought treatment with Gara Medical at a No-Fault Clinic located at 97-01 101st Avenue, Ozone Park, NY and underwent an initial examination with Dr. Gara on September 17, 2019. At the time of the initial examination, Dr. Gara issued a prescription for Diclofenac Gel 3% which was dispensed and billed for by Affinity Rx on October 1, 2019. On October 13, 2019, IVS Pharmacy dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patches, and Lidocaine 5% Ointment, and identified Dr. Gara as the Prescribing Provider on it claims for reimbursement. Notably, IVS Pharmacy did not submit any prescription in support of its charges, and there is no indication that Dr. Gara

performed a follow-up examination on the Insured, or issued any additional prescriptions, on or before October 13, 2019.

- Insured M.V. was allegedly involved in a motor vehicle accident on August 12, 2019. Thereafter, he sought treatment at a No-Fault Clinic located at 1650 Eastern Parkway, Brooklyn, NY. On August 29, 2019, he underwent an initial examination with Cathy Delerme-Pagan, M.D. ("Dr. Delerme-Pagan") of 406 Medical, P.C. ("406 Medical"). At the time of the initial examination, Dr. Delerme-Pagan issued a prescription for ibuprofen which was dispensed and billed for by Affinity Rx on October 16, 2019. On October 20, 2019, IVS Pharmacy dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patches, and Lidocaine 5% Ointment, and identified Dr. Delerme-Pagan as the Prescribing Provider on it claims for reimbursement. Notably, IVS Pharmacy did not submit any prescription in support of its charges, and there is no indication that Dr. Delerme-Pagan performed a follow-up examination on the Insured, or issued any additional prescriptions, on or before October 20, 2019.

- Insured K.H. was allegedly involved in a motor vehicle accident on June 20, 2019. Thereafter, she sought treatment with 406 Medical at a No-Fault Clinic located at 1650 Eastern Parkway, Brooklyn, NY, and underwent an initial examination with Dr. Delerme-Pagan on July 3, 2019. At the time of the initial examination, Dr. Delerme-Pagan issued prescriptions for Lidocaine 5% Ointment (with one refill) which was dispensed and billed for by Affinity Rx on July 23, 2019 and August 23, 2019. On October 15, 2019, IVS Pharmacy dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patches, and Lidocaine 5% Ointment, and identified Dr. Delerme-Pagan as the Prescribing Provider on it claims for reimbursement. Notably, IVS Pharmacy did not submit any prescription in support of its charges, and there is no indication that Dr. Delerme-Pagan performed a follow-up examination on the Insured, or issued any additional prescriptions, on or before October 15, 2019.

- Insured C.M. was allegedly involved in a motor vehicle accident on December 26, 2018. Thereafter, he sought treatment at a No-Fault Clinic located at 2098 Rockaway Parkway, Brooklyn, NY. On January 3, 2019, he underwent an initial examination with Nicole Hidalgo, N.P. ("NP Hidalgo") of New York Pain Management Associates ("New York Pain") who recommended the Insured receive Lidocaine 5% Ointment and nabumetone. There is no indication that these prescriptions were dispensed to the Insured at that time. On January 4, 2019, the Insured sought treatment at a different No-Fault Clinic located at 2363 Ralph Avenue, Brooklyn, NY, and on January 9, 2019 began treating with Regional Medical Group in Atlanta, GA. **C.M. was discharged from treatment on March 27, 2019**. Nevertheless, on July 17, 2019 – seven months after he ceased treating in the state of New York with NP Hidalgo and New York Pain, and over three months after he was discharged from treatment – Malvina dispensed and billed for Lidocaine 5% Ointment and Diclofenac Gel 3% pursuant to prescriptions issued by PA Hidalgo on January 3, 2019.

99.    Notably, each year approximately 4.5 million ambulatory care visits and 100,000 deaths in the United States occur as a result of adverse drug reactions.  A substantial number of these adverse drug reactions are the result of improper prescription practices, such as those demonstrated herein, including improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

100.    Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., naproxen and Diclofenac Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

101.    In keeping with the fact that the Fraudulent Pharmaceuticals were prescribed, dispensed, and billed pursuant to fraudulent, predetermined protocols and collusive arrangements, and at the detriment of patient health and safety, at times the Prescribing Providers issued multiple prescriptions for the same Fraudulent Pharmaceuticals, including multiple Fraudulent Topical Pain Products, on the same date to the same patient. Pursuant to the collusive arrangements with the Pharmacy Defendants, these duplicate prescriptions were steered to Malvina or IVS Pharmacy, as well as other pharmacies, to support the fraudulent billing submitted by them. At other times, the *same exact prescription* was steered to multiple pharmacies in order to support the fraudulent billing submitted by them.  For example:

- Insured E.H. was allegedly involved in a motor vehicle accident on July 19, 2019. He sought treatment at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, NY. On July 26, 2019, he underwent an initial examination with Dr. Gara of Gara Medical who issued a prescription, dated July 26, 2019, for Diclofenac Gel 3% with no refills. On August 9, 2019, Advanced Pharmacy One, Inc. dispensed and billed for Diclofenac Gel 3% pursuant to the prescription Dr. Gara issued on July 26, 2019.  Thereafter, on October 20, 2019, IVS Pharmacy

dispensed and billed for Diclofenac Gel 3% and, in support of its charges, submitted the **same exact prescription** which was issued by Dr. Gara on July 26, 2019 and previously filled by Advanced Pharmacy One, Inc. Notably, IVS Pharmacy, on the same date it dispensed and billed for the Diclofenac Gel 3%, also dispensed and billed for Lidocaine 5% Ointment and Lidocaine 5% Patches, despite the fact that the prescription did not call for these Fraudulent Topical Pain Products.

- Insured J.G. was allegedly involved in a motor vehicle accident on September 3, 2019. She sought treatment with Gara Medical at a No-Fault Clinic located at 97-01 101st Avenue, Ozone Park, NY and underwent an initial examination with Dr. Gara on September 10, 2019. Upon initial examination, Dr. Gara issued a prescription, dated September 10, 2019, for Diclofenac Gel 3% with no refills. On September 17, 2019, Affinity Rx dispensed and billed for Diclofenac Gel 3% pursuant to the prescription Dr. Gara issued on September 10, 2019. Thereafter, on October 13, 2019, IVS Pharmacy dispensed and billed for Diclofenac Gel 3% and, in support of its charges, submitted the **same exact prescription** which was issued by Dr. Gara on September 10, 2019 and previously filled by Affinity Rx. Notably, IVS Pharmacy, on the same date it dispensed and billed for the Diclofenac Gel 3%, also dispensed and billed for Lidocaine 5% Ointment and Lidocaine 5% Patches, despite the fact that the prescription did not call for these Fraudulent Topical Pain Products. Moreover, although noting in his examination report that the patient is breastfeeding, Dr. Gara prescribed Diclofenac Gel 3%, and the Pharmacy Defendants dispensed Diclofenac Gel 3% (and Lidocaine 5% Ointment and Lidocaine 5% Patches) to this patient. According to the FDA Medication Guidelines for Diclofenac Gel 3%, women who are breastfeeding should not use Diclofenac Gel 3%. Additionally, the use of Lidocaine 5% Patches has not been studied in nursing mothers, though studies have shown that lidocaine is excreted in breastmilk. There is no indication in the patient's records that she consulted with her obstetrician or pediatrician, or that she was recommended to do so by Dr. Gara prior to receiving these Fraudulent Topical Pain Products.

- Insured J.C. was allegedly involved in a motor vehicle accident on July 19, 2019. She sought treatment with Gara Medical at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, NY and underwent an initial examination with Dr. Gara on July 29, 2019. Upon initial examination, Dr. Gara issued a prescription, dated July 29, 2019, for Diclofenac Gel 3% with no refills. On August 12, 2019, Advanced Pharmacy One, Inc. dispensed and billed or Diclofenac Gel 3% pursuant to the prescription Dr. Gara issued on July 29, 2019. On September 22, 2019, Affinity Rx dispensed and billed for Diclofenac Gel 3% pursuant to a second prescription issued by Dr. Gara on September 6, 2019. Thereafter, on October 14, 2019, IVS Pharmacy dispensed and billed for Diclofenac Gel 3% and, in support of its charges, submitted the **same exact prescription** which was issued by Dr. Gara on July 29, 2019 and previously filled by Advanced Pharmacy One, Inc. Notably, IVS Pharmacy, on the same date it dispensed and billed for the Diclofenac Gel 3%, also dispensed and billed for Lidocaine 5% Ointment and

Lidocaine 5% Patches despite the fact that the prescription did not call for these Fraudulent Topical Pain Products.

- Insured M.J. was allegedly involved in a motor vehicle accident on July 31, 2019. She sought treatment with Gara Medical at a No-Fault Clinic located at 97-10 101st Avenue, Ozone Park, NY and underwent an initial examination with Dr. Gara on August 27, 2019. Upon initial examination, Dr. Gara issued a prescription, dated August 27, 2019, for Diclofenac Gel 3% and Lidocaine 5% Patches with no refills. On September 5, 2019, Advanced Pharmacy One, Inc. dispensed and billed for Diclofenac Gel 3% and Lidocaine 5% Patches pursuant to the prescription Dr. Gara issued on August 27, 2019. Thereafter, on October 13, 2019, IVS Pharmacy dispensed and billed for Diclofenac Gel 3% and Lidocaine 5% Patches and, in support of its charges, submitted the **same exact prescription** which was issued by Dr. Gara on August 27, 2019 and previously filled by Advanced Pharmacy One, Inc. Notably, IVS Pharmacy, on the same date it dispensed and billed for the Diclofenac Gel 3% and Lidocaine 5% Patches, also dispensed and billed for Lidocaine 5% Ointment despite the fact that the prescription did not call for this Fraudulent Topical Pain Product. Moreover, this patient's medical history includes, among others, a blood clotting disorder and deep vein thrombosis (blood clots in the veins), and the patient is on a daily dose of the blood thinning anticoagulant Eliquis. This patient's medical history and her daily use of an anticoagulant are contraindications to the use of Diclofenac Gel 3% and place her at increased risk of adverse events.

- Insured E.A. was allegedly involved in a motor vehicle accident on July 15, 2019. Thereafter, he sought treatment with Dr. Gara at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, NY.  On August 12, 2019, Dr. Gara issued electronic prescriptions for Diclofenac Gel 3% and Lidocaine 5% Patches which were dispensed and billed by Alexia's Pharmacy, Inc. on August 31, 2019. Notably, on August 12, 2019, the date Dr. Gara issued the electronic prescriptions filled by Alexia's Pharmacy, Inc., he also issued a Fraudulent Prescription Form for Diclofenac Gel 3% and Lidocaine 5% Patches. This Fraudulent Prescription Form was routed to IVS Pharmacy which dispensed and billed the Diclofenac Gel 3% and Lidocaine 5% Patches on October 14, 2019.  Furthermore, on October 14, 2019, IVS Pharmacy also dispensed and billed for Lidocaine 5% Ointment pursuant to the Fraudulent Prescription Form Dr. Gara signed on August 12, 2019, despite the fact that the prescription did not call for this Fraudulent Topical Pain Product.

- Insured R.A. was allegedly involved in a motor vehicle accident on September 20, 2019.  Thereafter, she sought treatment with Gara Medical at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, NY. On October 3, 2019, Dr. Gara issued a prescription for Diclofenac Gel 3% with no refills which was dispensed and billed by IVS Pharmacy on October 14, 2019.  On October 14, 2019, IVS Pharmacy also dispensed and billed for Lidocaine 5% Ointment and Lidocaine 5% Patches and in support of its charges, submitted the prescription Dr. Gara

signed on October 3, 2019, despite the fact that the prescription did not call for these Fraudulent Topical Pain Products. Furthermore, on October 24, 2019, Affinity Rx dispensed and billed for Diclofenac Gel 3% and, in support of its charges, submitted the **same exact prescription** which was issued by Dr. Gara on October 3, 2019 and previously filled by IVS Pharmacy.

- Insured C.C. was allegedly involved in a motor vehicle accident on July 25, 2019. Thereafter, he sought treatment with Dr. Gara at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, NY. On August 19, 2019, Dr. Gara issued a prescription for Diclofenac Gel 3% and Lidocaine 5% Patches with no refills, and on September 6, 2019, Advanced One Pharmacy, Inc. dispensed and billed for Diclofenac Gel 3% pursuant to the prescription issued by Dr. Gara on August 19, 2019. On October 14, 2019, IVS Pharmacy dispensed and billed for Diclofenac Gel 3% and Lidocaine 5% Patches and, in support of its charges, submitted the **same exact prescription** which was issued by Dr. Gara on August 19, 2019 and previously filled by Advanced Pharmacy One, Inc. On October 14, 2019, IVS Pharmacy also dispensed and billed for Lidocaine 5% Ointment and in support of its charges, submitted the prescription Dr. Gara issued on August 19, 2019, despite the fact that the prescription did not call for this Fraudulent Topical Pain Product.

- Insured W.M. was allegedly involved in a motor vehicle accident on August 8, 2019. Thereafter, he sought treatment with Dr. Gara at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, NY. On August 30, 2019, Dr. Gara issued a prescription for Diclofenac Gel 3% and Lidocaine 5% Patches with no refills, and on September 13, 2019, Advanced One Pharmacy, Inc. dispensed and billed for Diclofenac Gel 3% pursuant to the prescription issued by Dr. Gara on August 30, 2019. On October 14, 2019, IVS Pharmacy dispensed and billed for Diclofenac Gel 3% and Lidocaine 5% Patches and, in support of its charges, submitted the **same exact prescription** which was issued by Dr. Gara on August 30, 2019 and previously filled by Advanced Pharmacy One, Inc. On October 14, 2019, IVS Pharmacy also dispensed and billed for Lidocaine 5% Ointment and in support of its charges, submitted the prescription Dr. Gara signed on August 30, 2019, despite the fact that the prescription did not call for this Fraudulent Topical Pain Product.

102.   Not only are these practices clearly part of a fraudulent scheme designed to maximize profit, but they also constitute therapeutic duplication and increase the risk of adverse drug reactions to the patients subjected to them.

i.   **The Fraudulent Diclofenac Gel and Lidocaine Ointment Prescriptions**

103.   In accordance with the fraudulent scheme discussed above, Malvina and IVS

Pharmacy primarily and routinely billed GEICO for the exorbitantly priced topical NSAID Diclofenac Sodium, almost exclusively in the form of Diclofenac Gel 3% ("Topical Diclofenac"), and the topical anesthetic Lidocaine 5% Ointment, pursuant to duplicitous prescriptions solicited from Prescribing Providers and Clinic Controllers in exchange for kickbacks or other financial incentives.

104.    The Pharmacy Defendants solicited the Prescribing Providers and the Clinic Controllers to provide them with voluminous prescriptions for Topical Diclofenac because the Pharmacy Defendants could readily buy Topical Diclofenac at low cost but submit claims for reimbursement through Malvina and IVS Pharmacy to GEICO and other New York No-Fault insurers for huge sums based on egregiously inflated wholesale prices.

105.    The United States Food and Drug Administration ("FDA") requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

106.    A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA, and is designed to call attention to serious or life-threatening risks associated with the drug or product.

107.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

108.    Indeed, Diclofenac Gel 3%, the Topical Diclofenac that the Prescribing Providers primarily prescribe, and the Pharmacy Defendants primarily dispense and bill for, is only

indicated for the treatment of actinic (or solar) keratosis – a skin condition caused by years of excessive sun exposure.

109.    Notwithstanding the most common and accepted uses for Topical Diclofenac, or the risks associated with the drug, the Pharmacy Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of Topical Diclofenac, while they oftentimes recommended the patient continue the use of oral NSAIDs or simultaneously prescribed oral NSAIDs – such as celecoxib (or its brand name equivalent, Celebrex), meloxicam, ibuprofen, or naproxen – and other Fraudulent Pharmaceuticals such as the Fraudulent Topical Pain Products.

110.    Prescribing Topical Diclofenac, while simultaneously prescribing or recommending the patient take oral NSAIDs, is therapeutic duplication which results in increased risk with no additional therapeutic benefit.

111.    Nevertheless, Prescribing Providers consciously prescribed and the Pharmacy Defendants consciously dispensed Topical Diclofenac in conjunction with oral NSAIDs and/or Fraudulent Topical Pain Products to numerous Insureds, despite the risks it posed to the Insureds' health and well-being.  For example:

- Insured L.E. was allegedly involved in a motor vehicle accident on January 29, 2019.  On February 6, 2019, she sought treatment with Metro Pain at a No-Fault Clinic located at 1767 Southern Blvd., Bronx, NY and underwent an initial examination with Dr. Seyoum who issued a prescription for Diclofenac Gel 3%, Lidocaine 5% Patches, Flexeril (cyclobenzaprine) and naproxen. These prescriptions were dispensed and billed by Merrick Wellness, Inc. on February 7, 2019. On July 3 2019, Dr. Seyoum performed a follow-up examination on the Insured, and on July 10, 2019, Malvina dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patches, cyclobenzaprine, and ibuprofen pursuant to a Fraudulent Prescription Form signed by Dr. Seyoum on July 3, 2019.

- Insured J.J. was allegedly involved in a motor vehicle accident on June 13, 2019. Thereafter, he sought treatment with BSS Medical at a No-Fault Clinic located at 828 Utica Avenue, Brooklyn, NY. On July 11, 2019, he underwent an initial examination with Dr. Sawhney who recommended the Insured receive Diclofenac Gel 3%, Mobic (meloxicam), and cyclobenzaprine.  On July 23, 2019, Malvina

dispensed and billed for Diclofenac Gel 3%, meloxicam, and cyclobenzaprine pursuant to a Fraudulent Prescription Form signed by Dr. Sawhney on July 11, 2019, and which allowed for one refill of each Fraudulent Pharmaceutical prescribed.

- Insured A.O. was allegedly involved in a motor vehicle accident on May 23, 2019. Thereafter, he sought treatment with BSS Medical at a No-Fault Clinic located at 828 Utica Avenue, Brooklyn, NY. On July 11, 2019, he underwent an initial examination with Dr. Sawhney who recommended the Insured receive Diclofenac Gel 3%, Mobic (meloxicam), and cyclobenzaprine.  On July 23, 2019, Malvina dispensed and billed for Diclofenac Gel 3%, meloxicam, and cyclobenzaprine pursuant to a Fraudulent Prescription Form signed by Dr. Sawhney on July 11, 2019, and which allowed for one refill of each Fraudulent Pharmaceutical prescribed.

- Insured K.W. was allegedly involved in a motor vehicle accident on July 14, 2019. Thereafter, he sought treatment with BSS Medical at a No-Fault Clinic located at 828 Utica Avenue, Brooklyn, NY. On July 23, 2019, Malvina dispensed and billed for Diclofenac Gel 3%, meloxicam, and cyclobenzaprine pursuant to a Fraudulent Prescription Form signed by Dr. Sawhney on July 18, 2019, and which allowed for one refill of each Fraudulent Pharmaceutical prescribed.

- Insured R.C. was allegedly involved in a motor vehicle accident on July 5, 2019. Thereafter, he sought treatment with Metro Pain at a No-Fault Clinic located at 1767 Southern Blvd., Bronx, NY. On July 10, 2019, she underwent an initial examination with Dr. Seyoum who recommended the Insured receive Diclofenac Gel 3%, Lidoderm (lidocaine) 5% patches, Flexeril (cyclobenzaprine), and ibuprofen. On July 12, 2019, Malvina dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patches, ibuprofen, and cyclobenzaprine pursuant to a Fraudulent Prescription Form signed by Dr. Seyoum on July 10, 2019.

- Insured P.H. was allegedly involved in a motor vehicle accident on June 9, 2019. Thereafter, he sought treatment with Metro Pain at a No-Fault Clinic located at 1767 Southern Blvd., Bronx, NY. On June 12, 2019, he underwent an initial examination with Dr. Seyoum who recommended the Insured receive Diclofenac Gel 3%, Flexeril (cyclobenzaprine), and ibuprofen. On June 18, 2019, Malvina dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patches, ibuprofen, and cyclobenzaprine pursuant to an undated Fraudulent Prescription Form signed by Dr. Seyoum.

- Insured N.L. was allegedly involved in a motor vehicle accident on February 28, 2019. Thereafter, she sought treatment with Metro Pain at a No-Fault Clinic located at 1767 Southern Blvd., Bronx, NY. On March 6, 2019, she underwent an initial examination with Dr. Seyoum who recommended the Insured receive Lidoderm (lidocaine) 5% Patches, Flexeril (cyclobenzaprine), and ibuprofen. On

March 7, 2019, LPM Pharmacy, Inc. dispensed and billed for Lidocaine 5% Ointment, Lidocaine 5% Patches, cyclobenzaprine, and ibuprofen pursuant to electronic prescriptions issued by Dr. Seyoum on March 6, 2019. On April 12, 2019, LPM Pharmacy, Inc. dispensed and billed for Lidocaine 5% Ointment, Lidocaine 5% Patches, cyclobenzaprine, and naproxen pursuant to electronic prescriptions issued by Dr. Seyoum on April 8, 2019. On April 22, 2019, LPM Pharmacy, Inc. dispensed and billed for Diclofenac Gel 3% pursuant to a prescription issued by Alexander Zhuravkov, M.D. on April 17, 2019. On June 7, 2019, LPM Pharmacy, Inc. dispensed and billed for Lidocaine 5% Ointment and cyclobenzaprine pursuant to electronic prescriptions issued by Dr. Seyoum on June 5, 2019. On August 12, 2019, Malvina dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patches, and Celebrex (celecoxib) pursuant to a Fraudulent Prescription Form signed by Dr. Seyoum on August 8, 2019.

- Insured L.T.P. was allegedly involved in a motor vehicle accident on April 12, 2019. Thereafter, he sought treatment with Metro Pain at a No-Fault Clinic located at 1767 Southern Blvd., Bronx, NY. On August 21, 2019, he underwent a follow-up examination with Dr. Seyoum who recommended the Insured receive Lidoderm (lidocaine) 5% Patches and celecoxib. On August 27, 2019, Malvina dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patches, and Celebrex (celecoxib) pursuant to a Fraudulent Prescription Form signed by Dr. Seyoum on August 21, 2019.

- Insured A.T. was allegedly involved in a motor vehicle accident on June 9, 2019. Thereafter, she sought treatment with Metro Pain at a No-Fault Clinic located at 1767 Southern Blvd., Bronx, NY. On June 12, 2019, she underwent an initial examination with Dr. Seyoum who recommended the Insured receive Diclofenac Gel 3%, Flexeril (cyclobenzaprine), and naproxen. On June 18, 2019, Malvina dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patches, and cyclobenzaprine pursuant to a Fraudulent Prescription Form signed by Dr. Seyoum on June 12, 2019. Notably, neither the initial examination nor the Fraudulent Prescription Form called for Lidocaine 5% Patches. Dr. Seyoum performed a follow-up examination on July 31, 2019 and recommended the patient receive Flexeril (cyclobenzaprine) and ibuprofen. On August 2, 2019, Malvina dispensed and billed for Diclofenac Gel 3%, cyclobenzaprine, and ibuprofen pursuant to a Fraudulent Prescription Form signed by Dr. Seyoum on July 31, 2019.

- Insured I.B. was allegedly involved in a motor vehicle accident on May 27, 2019. Thereafter, he sought treatment at a No-Fault Clinic located at 828 Utica Avenue, Brooklyn, NY. On June 25, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment and Lidocaine 5% Patches pursuant to an undated Fraudulent Prescription Form signed by Dr. Wong. Notably, there is no indication that Dr. Wong examined this patient on or before June 25, 2019. On August 1, 2019, Dr. Sawhney of BSS Medical allegedly performed a follow-up examination on I.B. and recommended the patient receive prescriptions for Mobic (meloxicam),

cyclobenzaprine, and "lidocaine gel and patches."  On August 5, 2019, Malvina dispensed and billed for meloxicam, cyclobenzaprine, and Diclofenac Gel 3% pursuant to a Fraudulent Prescription Form signed by Dr. Sawhney on August 1, 2019.

112.    By prescribing and dispensing NSAIDs and other Fraudulent Topical Pain Products in conjunction with Topical Diclofenac, the Prescribing Providers and the Pharmacy Defendants engaged in therapeutic duplication and put patients at increased risk of serious cardiovascular and gastrointestinal events as the use of oral NSAIDs increases the "Black Box Warning" risks associated with diclofenac sodium.

113.    Moreover, at times, the Prescribing Providers prescribed and the Defendants dispensed Topical Diclofenac contemporaneous to muscle relaxants such as cyclobenzaprine.

114.    In accordance with best practices, a prescription for a seven to ten day supply of cyclobenzaprine may be appropriate during the *acute* stages of injury.  However, the Prescribing Providers prescribed and the Pharmacy Defendants dispensed thirty-day or more supplies of cyclobenzaprine, and at times such prescriptions were issued well past the acute stages of injury.

115.    The Topical Diclofenac was prescribed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

116.    In keeping with the fact that Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety (and as demonstrated in the various claims examples throughout this Complaint), the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed diclofenac sodium.

117.    In further keeping with the fact that the Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribing Providers virtually never addressed whether the Topical Diclofenac prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

118.    The Pharmacy Defendants' billing submitted through Malvina and IVS Pharmacy to GEICO for Topical Diclofenac exceeded $584,100.00.

119.    Specifically, the Pharmacy Defendants almost exclusively dispensed and billed for diclofenac sodium in the form of Diclofenac Gel 3%.  Malvina typically billed GEICO $1,891.00 for a single tube of Diclofenac Gel 3% and, to-date, billed GEICO over $232,600.00 for this Fraudulent Topical Pain Product.  Likewise, IVS Pharmacy typically billed GEICO between $1,891.00 and $2,834.00 for a single tube of Diclofenac Gel 3% and, to-date, billed GEICO over $351,500.00 for this Fraudulent Topical Pain Product.

120.    Not surprisingly, the Office of Inspector General of the U.S. Department of Health & Human Services recently issued a report which noted that one of the most common products billed for by pharmacies with questionable billing was diclofenac sodium because, among other reasons, there is a striking difference between the cost of a compounded topical containing diclofenac sodium and a non-compounded version of the same drug. In that same report, the OIG also noted that many pharmacies in New York State are among the most questionable in the nation. See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

121.    In addition to the egregious number of Topical Diclofenac prescriptions dispensed by the Pharmacy Defendants, in accordance with the fraudulent scheme discussed above, the Pharmacy Defendants routinely billed GEICO for exorbitantly priced topical Lidocaine 5% Ointment, pursuant to duplicitous prescriptions solicited from the Prescribing Providers and Clinic Controllers in exchange for kickbacks or other incentives.

122.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.  Notably, lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

123.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, confusion, dizziness, tremors, convulsions, respiratory depression, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

124.    Despite this, the Prescribing Providers never recommended Insureds first use over-the-counter lidocaine ointments or lotions to treat their minor aches and pains which they sustained in fender-bender type motor vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers and Clinic Controllers routinely prescribed to Insureds, or caused the prescription of, Lidocaine 5% Ointment and directed the prescriptions to Malvina and IVS Pharmacy.

125.    For example,  the Prescribing Providers never recommended insureds first try Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% lidocaine and are available in a 2.7 oz. tube at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices in the range of $6.99 and $6.59, respectively.

126.    In keeping with the fact that the Pharmacy Defendants submitted bills pursuant to collusive arrangements with the Prescribing Providers and Clinic Controllers and pursuant to fraudulent, predetermined and profit-driven treatment protocols, the Lidocaine 5% Ointment prescriptions, like the Topical Diclofenac prescriptions, were often issued contemporaneous to over-the-counter oral NSAIDs.

127.    Moreover, despite the risks of lidocaine, the Prescribing Providers again engaged in therapeutic duplication in that they regularly prescribed, and the Pharmacy Defendants dispensed, multiple lidocaine products – such as MedX Patches (which contain lidocaine) and Lidocaine 5% Patches – contemporaneous to Lidocaine 5% Ointment.  For example:

- Insured S.W. was allegedly involved in a motor vehicle accident on April 11, 2019.  After treating at a No-Fault Clinic located at 5506 Avenue N, Brooklyn, NY, she sought treatment with Metro Pain at another No-Fault Clinic located at 3041 Avenue U, Brooklyn, NY and underwent an initial examination with Dr. Greco on July 8, 2019.  On July 11, 2019, Malvina dispensed and billed for Diclofenac Solution 1.5%, Lidocaine 5% Ointment, and Lidocaine 5% Patches pursuant to a Fraudulent Prescription Form signed by Dr. Greco on July 8, 2019.

- Insured D.D.S. was allegedly involved in a motor vehicle accident on April 21, 2019.  Thereafter, he sought treatment at a No-Fault Clinic located at 828 Utica Avenue Brooklyn, NY.  On May 13, 2019, he underwent an initial examination with Dr. Wong of Path to Wellness Medical, P.C. ("Path to Wellness"). On June 25, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment and Lidocaine 5% Patches pursuant to an undated Fraudulent Prescription Form signed by Dr. Wong.

- Insured M.F. was allegedly involved in a motor vehicle accident on April 18, 2019.  Thereafter, she sought treatment with Metro Pain at a No-Fault Clinic located at 1975 Linden Blvd., Elmont, NY and underwent an initial examination with Dr. Greco on April 23, 2019. On May 10, 2019, Modern Rx, Inc. dispensed

and billed for Diclofenac Gel 3%, Lidocaine 5% Ointment, and MedX Patches pursuant to a prescription issued by Dr. Greco on April 25, 2019. M.F. underwent a follow-up examination with Dr. Keum on July 11, 2019, and despite the fact that Dr. Keum left the pre-printed medication section of the examination report's treatment plan blank, on July 12, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment and Lidocaine 5% Patches pursuant to a Fraudulent Prescription Form signed by Dr. Keum on July 11, 2019.

- Insured K.A. was allegedly involved in a motor vehicle accident on March 10, 2019.  Thereafter she sought treatment at a No-Fault Clinic located at 1975 Linden Boulevard, Elmont, NY and underwent an initial examination with Dr. Greco on March 12, 2019. On March 18, 2019, Maspeth Rx Pharmacy dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to electronic prescriptions issued by Dr. Greco on March 14, 2019. On April 19, 2019, Maspeth Rx Pharmacy dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to electronic prescriptions issued by Dr. Greco on April 16, 2019.  On May 23, 2019, K.A. underwent a follow-up examination with Dr. Kim. Despite the fact that Dr. Kim left the preprinted medication section of the examination report's treatment plan blank, on June 3, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to a Fraudulent Prescription Form signed by Dr. Kim on May 23, 2019.

- Insured S.A. was allegedly involved in a motor vehicle accident on August 19, 2019.  Thereafter, she sought treatment with A to Z Medical Care, P.C. ("A to Z Medical") at a No-Fault Clinic located at 92-05 Rockaway Blvd., Ozone Park, NY.  On August 20, 2019, she underwent an initial examination with Dr. Delerme-Pagan who recommended the Insured receive Lidocaine 5% Ointment, ibuprofen, and methocarbamol.  On September 3, 2019, Affinity Rx dispensed and billed for Lidocaine 5% Ointment, ibuprofen, and methocarbamol pursuant to prescriptions issued by Dr. Delerme-Pagan on August 20, 2019.  Notably, the August 20, 2019 prescription for Lidocaine 5% Ointment allowed for two refills. Nevertheless, just one month later, on September 23, 2019, Dr. Delerme-Pagan issued prescriptions for Diclofenac Gel 3% and Lidocaine 5% Patches, as well as an additional prescription for Lidocaine 5% Ointment despite the fact that there is no indication she examined the Insured on this date.  On October 1, 2019, IVS Pharmacy dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patches, and Lidocaine 5% Ointment pursuant to the September 23, 2019 prescriptions. Affinity Rx dispensed and billed for two refills of Lidocaine 5% Ointment, pursuant to the August 20, 2019 prescription, on October 19, 2019 and November 8, 2019.

- Insured S.S. was allegedly involved in a motor vehicle accident on June 12, 2019. Thereafter, he sought treatment with A to Z Medical at a No-Fault Clinic located at 92-05 Rockaway Blvd., Ozone Park, NY.  On June 18, 2019, he underwent an initial examination with Henry Htay Myint, M.D. ("Dr. Myint") who recommended the Insured receive Lidocaine 5% Ointment, naproxen, and

methocarbamol. On June 27, 2019, Affinity Rx dispensed and billed for Lidocaine 5% Ointment, naproxen, and methocarbamol pursuant to prescriptions issued by Dr. Myint on June 18, 2019. Notably, the June 18, 2019 prescription for Lidocaine 5% Ointment allowed for one refill which Affinity Rx dispensed and billed for on July 29, 2019.   Dr. Delerme-Pagan performed a follow-up examination on August 20, 2019 at which time she did not indicate the Insured was to receive any additional medications.  Dr. Myint performed a follow-up examination on September 19, 2019 at which time he did not indicate the Insured was to receive any additional medications. Nevertheless, on October 1, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment and Lidocaine 5% Patches pursuant to prescriptions issued by Dr. Delerme-Pagan on September 23, 2019.

- Insured S.S. was allegedly involved in a motor vehicle accident on October 2, 2019.  Thereafter, she sought treatment with Metro Pain at a No-Fault Clinic located at 1975 Linden Blvd, Elmont, NY. On October 3, 2019, she underwent an initial examination with Dr. Kim who circled Lidocaine 5% Ointment and Lidocaine 5% Patches in the preprinted prescription medications section of the examination report. On October 7, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment and MedX Patches (which are reimbursed at a higher rate than Lidocaine 5% Patches) pursuant to a Fraudulent Prescription Form signed by Dr. Kim on October 3, 2019. Furthermore, on November 13, 2019, Albertson Pharmacy, Inc. dispensed and billed for Lidocaine 5% Ointment and MedX Patches pursuant to a prescription issued by Dr. Kim on November 5, 2019. Notably, at the time of his initial examination, Dr. Kim notes that the patient may be pregnant, but he nevertheless prescribed, and the Pharmacy Defendants dispensed, Lidocaine 5% Ointment and non-FDA approved MedX Patches. Moreover, Dr. Kim confirmed in his follow-up examination of S.S. November 5, 2019 that the patient is 10 weeks pregnant, yet he issued additional prescriptions for Lidocaine 5% Ointment and MedX Patches.  Notably, there have been no adequate and well-controlled studies of the use of lidocaine in pregnant women. The use of lidocaine during pregnancy is considered "Category B" which means it should only be used if absolutely clinically necessary.  There is no indication that the patient consulted with her obstetrician, or that she was advised to do so by Dr. Kim, prior to receiving these Fraudulent Topical Pain Products.

- Insured J.R. was allegedly involved in a motor vehicle accident on July 18, 2019. Thereafter, he sought treatment with Metro Pain at a No-Fault Clinic located at 1767 Southern Blvd., Bronx, NY. On July 19, 2019, he underwent an initial examination with Dr. Alleyne.  On July 31, 2019, Malvina dispensed and billed for Lidocaine 5% Ointment, Lidocaine 5% Patches, and ibuprofen pursuant to a Fraudulent Prescription Form signed by Dr. Alleyne on July 19, 2019.

- Insured W.O. was allegedly involved in a motor vehicle accident on August 8, 2019.  Thereafter, she sought treatment with A to Z Medical at a No-Fault Clinic located at 92-05 Rockaway Parkway, Brooklyn, NY and came under the care of

Dr. Delerme-Pagan. On October 1, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment, Lidocaine 5% Patches, and Diclofenac Gel 3% pursuant to prescriptions issued by Dr. Delerme-Pagan on September 23, 2019.

- Insured M.S. was allegedly involved in a motor vehicle accident on May 26, 2019. Thereafter, she sought treatment with A to Z Medical at a No-Fault Clinic located at 92-05 Rockaway Parkway, Brooklyn, NY and came under the care Dr. Delerme-Pagan. On October 1, 2019, IVS Pharmacy dispensed and billed for Lidocaine 5% Ointment, Lidocaine 5% Patches, and Diclofenac Gel 3% pursuant to prescriptions issued by Dr. Delerme-Pagan on September 23, 2019.

128.  The initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was prescribed Lidocaine 5% Ointment.  Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

129.  Notably, the Pharmacy Defendants' billing submitted through Malvina and IVS Pharmacy to GEICO for Lidocaine 5% Ointment exceeded $673,700.00.

130.  Specifically, Malvina typically billed GEICO between $1,223.00 and $1,527.50 for a single prescription of Lidocaine 5% Ointment and, to-date, billed GEICO over $310,700.00 for this Fraudulent Topical Pain Product. Likewise, IVS Pharmacy typically billed GEICO between $1,223.00 and $1,832.00 for a single prescription of Lidocaine 5% Ointment and, to-date, billed GEICO over $362,000.00 for this Fraudulent Topical Pain Product.

131.  The Pharmacy Defendants' egregious billing coupled with the fact that the Prescribing Providers failed to properly document – or even document at all – the prescriptions for Topical Diclofenac and Lidocaine 5% Ointment, or the Insureds' use of these medications, further indicates that there is no legitimate medical reason for the Prescribing Providers to have

prescribed large volumes of these medications to the Insureds, particularly given the potential for adverse health effects.

### ii.      The Fraudulent Pain Patch Prescriptions

132.    As a further part of the scheme, the Pharmacy Defendants routinely billed GEICO for exorbitantly priced pain patches in the form of non-FDA approved MedX Patches and Lidocaine 5% Patches ("Lidocaine Patches") (together, the "Fraudulent Pain Patches"), pursuant to duplicitous prescriptions solicited from the Prescribing Providers and Clinic Controllers in exchange for kickbacks or other incentives.

133.    In keeping with the fact that the Pharmacy Defendants steered the Prescribing Providers to prescribe the Fraudulent Pharmaceuticals pursuant to predetermined protocols designed to maximize profits without regard for patient care, the Fraudulent Pain Patches, including the non-FDA approved MedX Patches, were routinely dispensed and billed at exorbitant prices despite the fact that there are other, less expensive, commercially available FDA-approved patches available.

134.    Notably, topical pain patches in which the primary ingredient is lidocaine are mainly used to treat *chronic post-herpetic neuropathic* pain (i.e., continued nerve pain after a patient recovers from shingles), although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is more attributable to its placebo effect rather than the pharmacological action of the patches themselves.  In fact, while application of pain patches in which the primary ingredient is lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

135.    Nevertheless, the Prescribing Providers routinely prescribed the Fraudulent Pain Patches to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents.

136.    The Fraudulent Pain Patches were routinely prescribed at the time of the initial examination – during the acute stages of the Insureds' pain symptoms.

137.    Like the prescriptions for Lidocaine 5% Ointment, the Prescribing Providers never recommended Insureds first use over-the-counter patches containing lidocaine – which are available to treat their often acute, minor strain/sprain injuries. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers routinely prescribed Insureds MedX and Lidocaine Patches, which were dispensed by Malvina and IVS Pharmacy.

138.    As with the prescriptions for the other Fraudulent Topical Pain Products, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even prescribed a Fraudulent Pain Patch. Likewise, the follow-up examination reports virtually never addressed whether the Fraudulent Pain Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

139.    In keeping with the fact that the Pharmacy Defendants act with gross indifference to patient care and safety, the patients were generally not instructed on the safe use, side effects or risks associated with the Fraudulent Pain Patches.  Moreover, despite these risks, as demonstrated in the claims examples, supra, the Prescribing Providers regularly prescribed, and the Pharmacy Defendants dispensed, MedX Patches  and/or Lidocaine Patches simultaneously to Lidocaine 5% Ointment.

140.    The Pharmacy Defendants' billing submitted through Malvina and IVS Pharmacy to GEICO for Fraudulent Pain Patches exceeded $292,200.00.

141.    Specifically, Malvina typically billed GEICO $2,381.00 per prescription for MedX Patches and between $454.40 and $679.10 per prescription for Lidocaine Patches.  To-date, Malvina billed GEICO over $73,800.00 for MedX Patches and over $48,600.00 for Lidocaine Patches, totaling in excess of $122,400.00 in billing for Fraudulent Pain Patches.

142.    Likewise, IVS Pharmacy typically billed GEICO $2,381.00 per prescription for MedX Patches and between $454.40 and $679.10 per prescription for Lidocaine Patches.  To-date, IVS Pharmacy billed GEICO over $60,700.00 for MedX Patches and over $109,100.00 for Lidocaine Patches, totaling in excess of $169,800.00 in billing for Fraudulent Pain Patches.

### C.  The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among the Pharmacy Defendants, Prescribing Providers and Clinic Controllers

143.    To effectuate the fraudulent scheme, the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to Malvina and IVS Pharmacy for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

144.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

145.    Here, the Pharmacy Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribing Providers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then direct those prescriptions to Malvina and IVS Pharmacy so that the Pharmacy Defendants could bill GEICO egregious sums.

146.    In furtherance of the scheme, the Prescribing Providers and Clinic Controllers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics and to route those prescriptions to the Pharmacy Defendants pursuant to the collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

147.    The Pharmacy Defendants supplied the Prescribing Providers and Clinic Controllers with preprinted Fraudulent Prescription Forms to steer the Prescribing Providers to prescribe Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products that Malvina and IVS Pharmacy dispensed, to patients of the No-Fault Clinics and direct those prescriptions to the Pharmacy Defendants.

148.    Alternatively, the Pharmacy Defendants supplied preset labels or rubber-stamps to the Prescribing Providers and Clinic Controllers to steer the Prescribing Providers to use the stamps or labels on their New York State prescription forms in order to prescribe the Fraudulent Pharmaceuticals.

149.    The purpose of the Pharmacy Defendants supplying the Prescribing Providers and Clinic Controllers with the Fraudulent Prescription Forms and stamps/labels was so that the

Prescribing Providers may conveniently and repeatedly issue predetermined, unnecessary prescriptions for the expensive Fraudulent Pharmaceuticals that Malvina and IVS Pharmacy "specialized" in dispensing in order to exploit the patients' No-Fault Benefits.

150.    The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Pharmacy Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and that the Fraudulent Pharmaceuticals were prescribed and dispensed without any attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

151.    The Prescribing Providers and Clinic Controllers never gave the Insureds the option to use a pharmacy of their choosing, rather the Prescribing Providers and Clinic Controllers directed the prescriptions for the Fraudulent Pharmaceuticals to Malvina and IVS Pharmacy, notwithstanding that (i) in many instances the No-Fault Clinics and the patients themselves were located far from Malvina and IVS Pharmacy on the border of Nassau and Queens Counties, in New York and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

152.    Upon information and belief, Malvina and IVS Pharmacy purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, without the patient ever

receiving the actual written prescription and, in many cases, without the patient even knowing that they were to receive a Fraudulent Pharmaceutical.

153.    Alternatively, the Insureds were given the Fraudulent Pharmaceuticals directly from the Clinic Controllers or front desk staff at the various No-Fault Clinics, again without ever seeing the actual prescription or, in many cases, not even knowing that they were to receive a Fraudulent Pharmaceutical.

154.    The Prescribing Providers and the Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by Malvina and IVS Pharmacy, and to ensure that the Pharmacy Defendants benefitted financially from the prescriptions.

155.    The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

156.    The Prescribing Providers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to Malvina and IVS Pharmacy rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

157.    The Prescribing Providers and the Clinic Controllers would not have engaged in the illegal, collusive arrangements with the Pharmacy Defendants in violation of New York law, including using Fraudulent Prescription Forms, rubber stamps or labels distributed by the Pharmacy Defendants, intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to Malvina and IVS Pharmacy, unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives such as employment at a No-Fault Clinic.

158.    But for the payments of kickbacks or other financial incentives from the Pharmacy Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to Malvina and IVS Pharmacy.

159.    The Pharmacy Defendants, Prescribing Providers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

160.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Pharmacy Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentive, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by Malvina and IVS Pharmacy.

161.    Upon information and belief, the payment of kickbacks by the Pharmacy Defendants was made at or near the time the prescriptions were issued.

**D.  The Fraudulent Billing the Pharmacy Defendants Submitted or Caused to be Submitted to GEICO**

162.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

163.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which

the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

164.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

165.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

166.    The Pharmacy Defendants solicited the Clinic Controllers and the Prescribing Providers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products because the Pharmacy Defendants could readily buy the Fraudulent Topical Pain Products at low cost, but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously inflated purported AWPs (average wholesale prices).

167.    The Pharmacy Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate the billing submitted through Malvina and IVS Pharmacy so as to maximize their profits.

168.    In support of their charges, the Pharmacy Defendants typically submitted only (i) the Prescribing Providers' prescription forms, and (ii) a HCFA-1500 Form, which included the purported NDC numbers, units, and corresponding charges for each drug product dispensed.

169.    The Pharmacy Defendants rarely ever submitted a delivery receipt confirming the Insureds actually received the medications billed to GEICO, or an executed AOB demonstrating that the Insureds in fact assigned their rights to No-Fault Benefits to the Pharmacy Defendants.

170.    The NDC numbers listed on the HCFA-1500 Form submitted by the Pharmacy Defendants is what identified the purported AWPs for each of the Fraudulent Pharmaceuticals. Notably, the Pharmacy Defendants rarely submitted an itemized invoice or any other documentation that allowed GEICO to identify from the billing submission alone what Fraudulent Pharmaceuticals the Pharmacy Defendants allegedly dispensed in correlation with the NDC numbers listed on the HCFA-1500 Form and in response to the duplicitous prescriptions.

171.    Moreover, the Pharmacy Defendants never submitted their wholesale purchase invoices demonstrating (i) how much the Pharmacy Defendants actually paid the supplier for the Fraudulent Pharmaceuticals, and (ii) whether the Pharmacy Defendants actually purchased the Fraudulent Pharmaceuticals with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

172.    In fact, the Pharmacy Defendants never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that they dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for Fraudulent Topical Pain Products.

173.    Further, upon information and belief, the Pharmacy Defendants often did not actually purchase the Fraudulent Topical Pain Products under the particular NDC number listed on their HCFA-1500 Forms. Rather, the Pharmacy Defendants purchased these products from different suppliers and/or in different quantities under NDC numbers with lower costs to the Pharmacy Defendants, but nonetheless used NDC numbers in their billing submissions that would generate the highest reimbursement amount in order to inflate their ill-gotten profits.

III.    **The Pharmacy Defendants' Submission of Fraudulent HCFA-1500 Forms to GEICO**

174.    To support the fraudulent charges, the Pharmacy Defendants have consistently

submitted to GEICO on behalf of Malvina and IVS Pharmacy HCFA-1500 Forms, the equivalent to the statutorily prescribed claim forms for No-Fault Benefits, seeking payment for the pharmaceuticals for which they are ineligible to receive payment.

175.    These claim submissions, including HCFA-1500 Forms and, at times, other supporting records that the Pharmacy Defendants submitted or caused to be submitted to GEICO, are false and misleading in the following material respects:

i.    The HCFA-1500 Forms and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

ii.    The HCFA-1500 Forms and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Pharmacy Defendants did not comply with all material licensing requirements in that the Pharmacy Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous and illegal prescriptions to Malvina and IVS Pharmacy for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives;

iii.    The HCFA-1500 Forms and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Pharmacy Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, duplicitous, and forged prescriptions; and

iv.    The HCFA-1500 Forms and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Pharmacy Defendants did not comply with all material licensing requirements in that

the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals.

## IV.   The Pharmacy Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

176.   The Pharmacy Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

177.   To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Pharmacy Defendants have gone to great lengths to systematically conceal their fraud.

178.   Specifically, the Pharmacy Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) Malvina and IVS Pharmacy were part of the same fraudulent scheme; (ii) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (iii) the Pharmacy Defendants were involved in collusive, kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing to GEICO and other New York insurance companies.

179.   The Pharmacy Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee.

180.    The billing and supporting documentation submitted by the Pharmacy Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

181.    The Pharmacy Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, the Pharmacy Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Malvina and IVS Pharmacy have been engaged in fraud.

182.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $102,900.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Pharmacy Defendants.

183.    Based upon the Pharmacy Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## THE FIRST CLAIM FOR RELIEF
### Against All Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

184.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

185.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $1,488,600.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through Malvina and IVS Pharmacy.

186.    Malvina and IVS Pharmacy have no right to receive payment for any pending bills submitted to GEICO because:

     i.     the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

     ii.     the Defendants engaged in illegal, collusive relationships in which the Defendants solicited and received illegal prescriptions from the Prescribing Providers and Clinic Controllers for the Fraudulent Pharmaceuticals in exchange for unlawful kickbacks and other financial incentives;

     iii.     the Defendants submitted or caused to be submitted charges for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, duplicitous. and forged prescriptions; and

     iv.     the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in violation of New York State regulatory and licensing requirements, rendering the pharmacy ineligible to receive reimbursement for No-Fault Benefits.

187.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Malvina and IVS Pharmacy have no right to receive payment in the amount of $614,200.00 and $874,300.00, respectively, for any pending bills submitted to GEICO.

## THE SECOND CLAIM FOR RELIEF
### Against All Defendants
### (Common Law Fraud)

188.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

189.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals.

190.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Malvina and IVS Pharmacy were acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants solicited and received illegal prescriptions from the Prescribing Providers and Clinic Controllers for the Fraudulent Pharmaceuticals in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Malvina and IVS Pharmacy were acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, duplicitous, forged prescriptions; and (iv) in every

claim, the representation that Malvina and IVS Pharmacy were acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in violation of New York State regulatory and licensing requirements, rendering the pharmacy ineligible to receive reimbursement for No-Fault Benefits.

191.   The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Malvina and IVS Pharmacy that were not compensable under the No-Fault Laws.  The chart attached hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to-date which the Pharmacy Defendants submitted, or caused to be submitted, to GEICO through the United States mail.

192.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $102,900.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Malvina and IVS Pharmacy.

193.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

194.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE THIRD CLAIM FOR RELIEF
### Against All Defendants
### (Unjust Enrichment)

195.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

196.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

197.    When GEICO paid the bills and charges submitted by or on behalf of Malvina and IVS Pharmacy for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

198.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

199.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

200.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $102,900.00.

## THE FOURTH CLAIM FOR RELIEF
### Against Nabieva and Vinyamin
### (Violation of RICO, 18 U.S.C. § 1962(c))

201.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

202.     Malvina and IVS Pharmacy are an ongoing "enterprise" (the "Malvina IVS Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

203.     Nabieva and Vinyamin knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Malvina IVS Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges and continuous efforts to collect on those charges to the present, seeking payments that Malvina and IVS Pharmacy were not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Malvina and IVS Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) the billed-for services were the product of illegal, invalid, duplicitous, and forged prescriptions; and (iv) the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

204.    The Malvina IVS Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Nabieva and Vinyamin operated Malvina and IVS Pharmacy, inasmuch as Malvina and IVS Pharmacy never were eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Malvina and IVS Pharmacy to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants have recently submitted further billing to GEICO while continuing to attempt collection on the fraudulent billing submitted through Malvina and IVS Pharmacy to the present day.

205.    The Malvina IVS Enterprise is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants.  These inherently unlawful acts are taken by the Malvina IVS Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

206.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $102,900.00 pursuant to the fraudulent bills submitted by the Defendants through the Malvina IVS Enterprise.

207.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THE FIFTH CLAIM FOR RELIEF**
**Against Nabieva and Vinyamin**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

208. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

209.   The Malvina IVS Enterprise is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

210.   Nabieva and Vinyamin are employed by and/or associated with the Malvina IVS Enterprise.

211.   Nabieva and Vinyamin knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Malvina IVS Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted hundreds of fraudulent charges and continuous efforts to collect on those charges seeking payments that the Malvina IVS Enterprise was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Malvina and IVS Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) the billed-for services were the product of illegal, invalid, duplicitous, and forged prescriptions; and (iv) the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with egregious charges, in place of other

effective, less costly pharmaceuticals solely for financial gain in violation of law.  The chart attached hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail and which comprise, in part, the pattern of racketeering activity identified through the date of this Complaint.

212.    Nabieva and Vinyamin knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

213.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $102,900.00 pursuant to the fraudulent bills submitted by the Malvina IVS Enterprise.

214.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Malvina and IVS Pharmacy have no right to receive payment in the amount of $614,200.00 and $874,300.00, respectively, for any pending bills submitted to GEICO;

B.    On the Second Claim For Relief against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $102,900.00,

together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

      C.     On the Third Claim For Relief against the Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $102,900.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

      D.     On the Fourth Claim For Relief against Nabieva and Vinyamin, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $102,900.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

      E.     On the Fifth Claim For Relief against Nabieva and Vinyamin, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $102,900.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
      July 23, 2020

                    RIVKIN RADLER LLP

                    By:   */s/ Michael A. Sirignano*
                            Michael A. Sirignano (MS 5263)
                            Barry I. Levy (BL 2190)
                            Priscilla D. Kam (PK 1505)
                    926 RXR Plaza
                    Uniondale, New York 11556
                    (516) 357-3000

                    *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*